# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRELL JOHNSON, | ) |
| Plaintiff, | ) Civil Action No. 14-1230 |
| v. | ) Judge Cathy Bissoon |
| DENNIS LOGAN, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

For the reasons stated below, Defendant's Motion for Summary Judgment (Doc. 42) will be granted.

## I. MEMORANDUM

**Factual and Procedural History**

On July 22, 1994, at approximately 1:00 a.m., Verna Robinson was fatally shot in the head in the Hazelwood neighborhood of Pittsburgh, Pennsylvania. Def's Facts at ¶ 1 (Doc. 44). Plaintiff Terrell Johnson ("Johnson") was convicted of the murder after a jury trial and served 18 years in prison. Def's Facts at ¶¶ 13, 18 (Doc. 44). Johnson was awarded a re-trial based on newly-discovered evidence, at which he was acquitted. Def's Facts at ¶¶ 14, 16, 18 (Doc. 44). In this civil action, he alleges that four City of Pittsburgh detectives violated his constitutional rights through malicious prosecution and reckless investigation in both the initial trial and the re-trial. See generally Compl. (Doc. 1).

Defendants Logan and Smallwood were part of the Homicide Unit of the City of Pittsburgh Police Department and participated in the initial investigation of the murder in 1994. Def's Facts at ¶ 3 (Doc. 44). Smallwood explained that an investigation is not something a

single detective does; rather, there are 14-16 other people in the unit and uniformed officers who work together to investigate crimes. Smallwood Dep. Tr. at 81 (Doc. 48, Exh. A). The evidentiary record in this case confirms that numerous different officers participated in the investigation of Verna Robinson's murder. See Doc. 44, Exh. A Initial Report (by Trosky and Fazio); Doc. 44, Exh. B Offense/Incident Report (by Sapp and Tevis); Doc. 44, Exh. C Supplemental Report by McCauley/Bassano; Doc. 44, Exh. D Supplemental Report by McDonald/McCauley; Doc. 44, Exh. E Supplemental Report by Kosanovich/Herrmann; Doc. 44, Exh. F Supplemental Report by Logan/Freeman; Doc. 44, Exh. G McBride Transcribed Statement (interview by Logan and Smallwood); Doc. 44, Exh. H Supplemental Report by Smallwood/Bauer; Doc. 44, Exh. I Supplemental Report Smallwood/Robinson; see also Doc. 48, Exh. G (Investigative File) (identifying additional persons involved in the investigation). There is no evidence that Defendants were in charge of the investigation.

Because the murder occurred at night, Logan and Smallwood were not the initial detectives involved in the case. Logan Dep. Tr. at 7-8 (Doc. 44, Exh. L) (George Trosky and Jim Fazio were the initial detectives); Smallwood Dep. Tr. at 10 (Doc. 44, Exh. M). Logan and Smallwood reported to work the next day and were assigned tasks as part of the unit to solve the crime. Id. Logan signed the affidavit of probable cause against Johnson, but testified that that did not mean that he was primarily responsible for investigating the case. Logan Dep. Tr. at 51-52 (Doc. 44, Exh. L); accord Smallwood Dep. Tr. at 10 (Doc. 44, Exh. M) (Logan was not the "lead detective" on the case). Their superiors - the sergeant, lieutenant, commander, assistant chief, deputy chief or chief of police - assigned them tasks, which Logan and Smallwood then performed. Logan Dep. Tr. at 6 (Doc. 44, Exh. L); Smallwood Dep. Tr. at 10 (Doc. 44, Exh. M).

Logan did not have authority to direct other detectives to perform tasks in the investigation. Logan Dep. Tr. at 18 (Doc. 44, Exh. L); Weismantle Dep. Tr. at 8 (Doc. 48, Exh. C). For example, it was a supervisor's decision whether to re-interview a witness based on receipt of information that impacted her credibility. Logan Dep. Tr. at 42 (Doc. 44, Exh. L). Moreover, the decision whether to file criminal charges is made by the District Attorney's office. Broman Dep. Tr. at 40-41 (Doc. 48, Exh. E). Logan testified that that decision was "well above [the detectives'] pay grade," although the District Attorney does rely on the police investigation. Logan Dep. Tr. at 50 (Doc. 44, Exh. L). The detectives work with an Assistant District Attorney ("ADA") and perform the tasks that are requested of them. Weismantle Dep. Tr. at 21 (Doc. 48, Exh. C).

In their initial investigation, detectives McCauley and Bassano learned that the day before the murder, July 21, 1994, Verna Robinson had been scheduled to testify against Anthony Griffin in a shooting trial, but the case was postponed. (Doc. 44, Exh. C). Verna Robinson had previously testified against Griffin in a juvenile hearing. Id. The detectives also learned that Robinson had previously testified against Terrell Johnson, in a case that had been held for court. Id. In an interview with detectives, Verna Robinson's mother, Barbara Robinson, told them that her daughter had been beaten by a friend of Anthony Griffin about a month earlier, who told her: "You won't tell nobody nothing." (Doc. 44, Exh. D). Barbara Robinson told the officers that she had seen Verna say "hi" to three black males walking by just prior to the shooting. (Doc. 44, Exh. B). Barbara Robinson stated that she had also seen three black males hop the fence in the rear of her residence the night before. Id.

3

The day after the murder, Johnson[1] voluntarily approached the police. (Doc. 44, Exh. E). Johnson assumed that he would be a suspect because he had been arrested for assaulting Verna Robinson earlier in 1994. Id. Johnson informed the police that he had nothing to do with Verna Robinson's murder and provided an alibi – namely, that he had been at the home of Ruth Roach and Stanley West, the aunt and uncle of LaCresia Roach, a girl he was dating at the time. Johnson told the officers that he fell asleep and never left the residence after 10:45 p.m. Id. Johnson told the officers that Ruth and Stanley departed the home around 11:00 p.m. and woke him up by knocking on the front door when they returned. Id. Johnson let them into the house and went back to bed. Id. Approximately one year later,[2] Ruth Roach and Stanley West provided a statement to detectives that Johnson had been in their home that evening with their six children; that they had walked to the bus stop, waited for LaCresia for about twenty minutes and then walked back home; that Johnson let them back into the home and went back upstairs; and that they were pretty sure they would have heard Johnson if he had tried to leave later that night. (Doc. 48, Exh. G at 26).

Five days after the murder, as she was being transported to jail after being arrested for shoplifting, Evelyn "Dolly" McBride told the transporting officers that she knew who killed the girl in Hazelwood last week. (Doc. 54, Exh. Y). Logan and Commander Ronald Freeman were assigned to interview McBride. The interview notes of McBride's statement are memorialized in Doc. 44, Exh. F. McBride had met a friend, Tony, at a bar earlier in the evening and then gone to Tony's apartment to get high. Id. She thought they were alone and was surprised when Verna

---

[1] The police report identifies Plaintiff as "Howard McKamey aka Terrel [sic] Johnson." (Doc. 44, Exh. E).

[2] The date on the police report, Thursday, June 29, 1994, is clearly wrong because it is prior to the shooting. The witness statement refers to Terrell Johnson having moved out several months after the shooting, in November or December, and having turned himself in to police in February. The Court takes judicial notice that June 29, 199**5** is a Thursday.

4

Robinson came out of the bathroom.  Id.  Robinson left after about five minutes and McBride left shortly thereafter because she was uneasy about the situation.  Id.  McBride stated that she heard the first shot as she was leaving the building and took cover for her own safety.  Id.  She heard Dorian Moorefield say "Kill the bitch."  Id.  Moments later, she saw two other actors, Harold Cabbagestalk and "Horseface," with guns in their hands.  Id.  McBride heard Cabbagestalk say "Yeah, bitch, die like your brother – this is what snitches get."  Id.  After the second shot, all three actors ran from the scene.  Id.  Plaintiff admits that McBride made this statement to the police but contends that she was not a reasonably trustworthy source of information.  Doc. 46.

Logan testified that once the report of the interview was completed, it would have been given to the sergeant in charge of homicide to decide what the next steps would be.  Logan Dep. at 16 (Doc. 48, Exh. B).  Logan explained that his job was to interview McBride; questions regarding her credibility were for his supervisors or the court to decide.  Logan Dep. at 25-26 (Doc. 48, Exh. B).  He would act on blatant lies, and the police would attempt to corroborate information at a later point, but he did not view it as his responsibility to tell a witness she didn't see what she said she saw.  Id.

On December 27, 1994, McBride made a taped statement for detectives Logan and Smallwood.  (Doc. 44, Exh. G).  In the statement, McBride gave further details about the shooting.  She also explained that "Horseface" was Plaintiff, the same person that Verna Robinson was going to testify against for beating her up.  Id.  Plaintiff "absolutely disputes" that he was known to anyone as "Horseface."  See Plaintiff's Response to CSMF 10 (Doc. 46). However, the transcript reflects:

> Q. And earlier you spoke about Horseface, do you know Horseface's real name?
> A. Terrell.

| | |
|---|---|
| Q. | Ok. Now is this the same Terrell that she was going to testify against? |
| A. | 'Fy against…right. Right for beatin' her up. He beat her up. |
| Q. | Ok, Terrell had beat up Verna? |
| A. | Verna, right. |
| Q. | But his nickname on the street is Horseface? |
| A. | Horseface … right. |

(Doc. 44, Exh. G at 6). See also id. at 10 (referring to Terrell Johnson as Horseface). McBride stated that she would "never forget the expression on his face" as he stood over Verna Robinson with his gun pointed right down at her. Id.

Smallwood testified that "we, meaning the [homicide] unit," made efforts to corroborate McBride's account but unfortunately, very few people in the area would talk to police because they feared retaliation. Smallwood Dep. at 41 (Doc. 44, Exh. M). Smallwood testified that she returned to the scene to verify whether McBride could have seen the murder from the vantage point she described. Smallwood Dep. at 46 (Doc. 44, Exh. M). Smallwood further explained that the prosecutor thought there was enough evidence and "it was the prosecutor's office that decided to try Terrell Johnson for criminal homicide." Smallwood Dep. at 81 (Doc. 48, Exh. A).

Terrell Johnson was charged with the murder of Verna Robinson on February 17, 1995. Doc. 44 at ¶ 13. The Commonwealth sought the death penalty. Doc. 46 at ¶ 20. He was convicted after a jury trial in June 1995 and sentenced to life imprisonment.[3] See Opinion of Pennsylvania Superior Court (Doc. 44, Exh. J; Doc. 48, Exh. F). The conviction and sentence was affirmed on direct appeal to the Pennsylvania Superior Court on January 30, 1997, and the

---

[3] Harold Cabbagestalk and Dorian Moorefield were tried separately. Doc. 46, ¶ 21. Cabbagestalk was convicted of criminal conspiracy, but acquitted of murder. Doc. 54, ¶ 22. Moorefield was acquitted of all charges.

Pennsylvania Supreme Court denied allowance of appeal.  Id.  On May 5, 1998, Johnson filed his first PCRA petition, alleging that his trial counsel was ineffective for having failed to call five witnesses or to investigate McBride's ability to see the shooting from her alleged location at the crime scene.  Id.  The PCRA court agreed with Johnson and ordered a new trial, but on March 15, 2001, the Pennsylvania Superior Court reversed that decision and upheld the conviction.  Id.

On January 4, 2006 (approximately eleven years after the original charges were filed), Johnson filed a second PCRA petition on the ground of newly-discovered exculpatory evidence. Id.  Specifically, Kenneth "Skinny" Robinson would testify that McBride was with him in a house many blocks away at the time Verna Robinson was shot, and thus, could not have been an eyewitness to the shooting.  Id.  The PCRA court dismissed the petition as untimely, but on April 17, 2007, the Superior Court reversed and remanded for an evidentiary hearing.  Id.  In its opinion, the Superior Court observed that McBride was the only witness to place Johnson at the scene of the crime and that her credibility was highly suspect (even without the newly discovered witness) because she was a crack addict with an extensive criminal history, did not volunteer the information until she was arrested for shoplifting five days later, and testified pursuant to a plea bargain.  Id.  Plaintiff was then granted a new trial.  Id.

The Allegheny County District Attorney's Office determined that Johnson would be re-tried before ADA Russ Broman.  Complaint at ¶ 57 (Doc. 1); Broman Dep. at 19 (Doc. 44, Exh. K).  Defendants Weisman and Canofari were assigned to assist Broman with the investigation for the retrial, although Canofari was involved to a lesser extent because he "was deployed a lot of the time."  Broman Dep. at 40 (Doc. 48, Exh. E).  In 2007-2008, Canofari was in Iraq and in 2011-2012, he was in Afghanistan.  Canofari Dep. at 23 (Doc. 44, Exh. N).  The "re-investigation" was not extensive and comprised six pages over five years.  (Doc. 48, Exh. H).

7

Canofari and Officer Provident interviewed Kenneth Robinson. Canofari had known Kenneth Robinson since Canofari was eight years old and knew that he had a bad drug problem. Canofari Dep. at 8, 10 (Doc. 44, Exh. N). Yet, Canofari did not do anything to verify or corroborate Kenneth Robinson's information. Canofari Dep. at 10 (Doc. 44, Exh. N). The only other documents in the re-investigation file consist of interviews regarding contacts with the Innocence Project and a memo that McBride may need witness protection services for the retrial. (Doc. 48, Exh. H). There is no evidence that either Canofari or Weismantle had any authority to determine the scope of the re-investigation. The re-trial did not occur until September 2012. (Doc. 44, ¶ 18). Johnson was found not guilty. Id.

The Complaint asserts claims against Logan and Smallwood for malicious prosecution and reckless investigation under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution for the original investigation, and against Canofari and Weismantle for malicious prosecution and reckless investigation for the re-trial. See generally Complaint (Doc. 1).

**Standard of Review**

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To withstand summary judgment, the non-movant must show a genuine dispute of

material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). "The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48. See, e.g., Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Rather, a dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. 249.

**Legal Analysis**

Defendants seek summary judgment on all claims. Although the existence of probable cause in a Section 1983 case is usually a question of fact, summary judgment is appropriate when the evidence, viewed in the light most favorable to the plaintiff, could not support a determination that an officer lacked probable cause. Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

## A. General Principles

To plead a cognizable malicious prosecution claim under Section 1983, a plaintiff must establish that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Kossler v. Crisanti, 564 F.3d 181, 187 (3d Cir. 2009).

"Although prosecutors rather than police officers are generally responsible for initiating criminal proceedings, an officer may, however, be considered to have initiated a criminal proceeding if he or she knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." Henderson v. City of Philadelphia, 853 F. Supp. 2d 514, 518 (E.D. Pa. 2012) (quoting Brockington v. City of Phila., 354 F.Supp.2d 563, 569 (E.D. Pa. 2005). Accord Wilson v. Dewees, 977 F. Supp. 2d 449, 458 (E.D. Pa. 2013) ("An individual [officer] can be liable for malicious prosecution if he fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute.") (citations omitted).

In Wilson v. Russo, the United States Court of Appeals for the Third Circuit drew a clear distinction between an officer's submission of knowingly false information and an officer's omission of relevant information. The Court of Appeals recognized that officers cannot be required to relate every detail of events and explained that "omissions are made with reckless disregard if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" 212 F.3d 781, 787–88 (3d

Cir. 2000) (quoting United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir.1993)). In Donahue v. Gavin, the court explained the distinction between omissions and affirmative misrepresentations in the context of a malicious prosecution claim:

> An individual can be liable for malicious prosecution if he or she "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." By contrast, where a police officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, that intermediary's independent decision to seek a warrant or to return an indictment breaks the casual chain and insulates the officer from a section 1983 claim based on lack of probable cause for an arrest or prosecution. Here, plaintiff does not present any evidence showing that defendants Pease and Girard knowingly provided false evidence to the prosecutors or otherwise interfered with the prosecutors' decision to initiate a prosecution.

2000 WL 772819, at *5 (E.D. Pa. 2000), aff'd, 280 F.3d 371 (3d Cir. 2002) (citations omitted).

Malicious prosecution claims are unique in that a plaintiff is required to "prove a negative" - that is, that the defendant officers initiated the charges *without* probable cause. It is well established that the requisite *lack* of probable cause is an essential element of the claim. See Wheeler v. Wheeler, 2016 WL 231581, at *2 (3d Cir. Jan. 20, 2016) (unpublished). To defeat a malicious prosecution claim, the officers need only satisfy "probable cause"; they need not develop evidence beyond a reasonable doubt. See Harris v. Doe, 2015 WL 4864904, at *4 (W.D. Pa. Aug. 13, 2015) (citing United States v. Miknevich, 638 F.3d 178, 182 (3d Cir.2011)) (proof beyond a reasonable doubt is not required when making a probable cause determination). The Court must perform a practical, common-sense analysis of whether there was probable cause to believe that Plaintiff committed a crime based on the information available to officers at the time. Estate of Smith v. Marasco, 318 F.3d 497, 522 (3d Cir. 2003); Goodwin v. Conway, 2016 WL 4728004, at *4 (3d Cir. Sept. 12, 2016) ("[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a

reasonable person to believe that an offense has been or is being committed by the person to be arrested."). In Dempsey v. Bucknell Univ., 834 F.3d 457, 475 (3d Cir. Aug. 22, 2016), the United States Court of Appeals for the Third Circuit emphasized that the standard is "merely a fair probability that the arrestee committed a crime," such that the affidavit need not identify "the same type of specific evidence of each element of [an] offense as would be needed to support a conviction."

Moreover, the existence of "some unreliability or exculpatory evidence will not fatally undermine[ ] probable cause otherwise established." Id. at 478 (internal quotations and citations omitted). "[O]mitted witness statements indicating that the interaction between [the students] was playful and, when it was not playful, [the alleged victim] was the aggressor" did not destroy the existence of probable cause. Id. at 479.

Notably, a positive identification by a victim witness is usually sufficient -- on its own -- to establish probable cause. Wilson, 212 F.3d at 790. In Wilson, for example, a robbery victim described the perpetrator as very tall (between 6'3" and 6'5") and between 190 and 200 pounds. The victim later identified a much smaller man (5'10"-5'11" and 160 pounds) as the perpetrator from a photo array. Despite these discrepancies, the court upheld the existence of probable cause, even though there was reason to view the victim's identification with some skepticism. Similarly, in Knight v. Borough of Penns Grove, 50 F. App'x 92 (3d Cir. 2002), the court upheld the existence of probable cause based on a victim identification even though: (1) a bartender had given a conflicting identification; (2) the victim had a high blood alcohol content; (3) the victim possessed cocaine at the time of the attack; and (4) there was a six-week gap between the attack and the identification. Nevertheless, the Knight Court granted summary judgment to the defendant officer on plaintiff's malicious prosecution and deficient investigation claims.

In addition to his malicious prosecution claim, Johnson asserts that his constitutional due process rights were violated by a reckless investigation. "To bring a successful due process claim for failure to investigate, a plaintiff must show that a police officer acted intentionally or recklessly, in a manner that shocks the conscience, in failing to investigate." Thomas v. Stanek, 2015 WL 757574, at *7 (W.D. Pa. 2015) (citing Wilson v. Lawrence Cnty., Mo., 260 F.3d 946, 955 (8th Cir. 2001)); Eckman v. Lancaster City, 742 F. Supp. 2d 638, 653 (E.D. Pa. 2010), aff'd, 515 F. App'x 93 (3d Cir. 2013) (citing Martin v. Anderson, 2008 WL 4761734, at *9 n.8 (E.D. Pa. Oct. 30, 2008)). "Failure to investigate is considered in tandem with the strength or weakness of the probable cause evidence." Id. Thus, "[w]here probable cause evidence is weak, officers may have a greater duty to consider potential exculpatory evidence." Id. (citing Walker v. Spiller, 1998 WL 306540, at *6 (E.D. Pa. June 9, 1998)). However, merely a "negligent failure to investigate does not create liability." K.L.Q. v. Plum Borough Sch. Dist., 2016 WL 2892174, at *6 (W.D. Pa. May 17, 2016). The Court turns now to application of these principles to the claims in this case.

**B. Claims Against Logan and Smallwood**

The gravamen of Plaintiff's legal theory is that detectives Logan and Smallwood knowingly or recklessly misstated and/or withheld material information about McBride's lack of credibility from prosecutors. See generally Pl.'s SJ Resp. (Doc. 45). It is important to emphasize that Plaintiff seeks to hold these two detectives individually liable. Even viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, he has failed to

satisfy three of the elements of the prima facie case for malicious prosecution.[4] Plaintiff also has failed to produce evidence in support of his reckless investigation claim.

Close scrutiny of Plaintiff's allegations reveals that he has not identified any affirmative false statements. Instead, he alleges numerous omissions. See generally Pl's CSMF's (Doc. 46). To wit, he contends that the police failed to do a background check on McBride to discover that she had used numerous aliases, had four different Social Security numbers, had pending criminal charges, had received drug rehabilitation paid for by the Commonwealth, had poor eyesight, was a drug addict and may have been under the influence of drugs the night of the murder.[5] Id. In addition, Plaintiff alleges that the police failed to take reasonable efforts to corroborate McBride's account by, *inter alia*, verifying that she was at Mr. Z's bar prior to the murder; interviewing the owner of the apartment where McBride claimed to have seen Tony and Verna Robinson; determining whether there was a gate that would have enabled McBride to reach her claimed vantage point; reconciling McBride's claimed time gap between the gunshots with the accounts of other witnesses; and verifying whether Gary Moorefield, with whom McBride claimed to have met immediately after the murder, was in Georgia that night. Id.

As a preliminary matter, the record is clear that neither Logan nor Smallwood initiated the criminal proceeding. The decision to pursue criminal charges was made by the District

---

[4] The Court does not reach the issue of whether an acquittal after a retrial based on newly-discovered evidence would satisfy the "favorable termination" element of the prima facie case. The general rule is that officers are evaluated based on the information available to them at the time charges are made. See Kossler, 564 F.3d at 194-95. But see Bronowicz v. Allegheny Cty., 804 F.3d 338, 346 (3d Cir. 2015) ("we consider whether the totality of the circumstances surrounding the prior proceedings reflect a favorable outcome for the plaintiff that would be consistent with the success of the plaintiff's § 1983 claims.")

[5] The initial interview report (Exhibit F) states that McBride went to Tony's apartment to get high. The jury in the first trial learned that McBride was a crack cocaine addict during her trial testimony. Exhibit Y.

Attorney's office. Smallwood Dep. at 81 (Doc. 48; Exh. A). There is no evidence that Logan or Smallwood interfered with this discretion. They were not the only detectives on the case; they were not the initial or lead detectives on the case; and they had no authority to direct the investigation. To the contrary, they acted as part of a unit and merely performed the investigative tasks that were assigned to them by their superiors. Plaintiff has failed to point to any conflicting evidence. Plaintiff's argument that Logan and Smallwood should be held liable because they had been "lead investigators" in other cases and had failed to identify "the actual lead detectives" in this case is unpersuasive. See Plaintiff's Response to CSMF 3 (Doc. 46). It is Plaintiff's burden, as part of his prima facie case, to prove that these Defendants initiated the criminal proceeding. He has failed to do so.

Second, the record is entirely void of any evidence that Logan or Smallwood acted maliciously or for any purpose other than solving the murder. Plaintiff has not pointed to any personal animus or reckless/intentional false statements. For largely the same reasons set forth above, Plaintiff cannot attribute the alleged omissions and/or the failures to corroborate McBride's testimony to Logan or Smallwood. Simply put, there is no evidence that Logan or Smallwood had any authority to do more. Even if the investigation, as a whole, was incomplete, Plaintiff has failed to introduce any evidence that such failures were due to intentional, reckless or conscious-shocking behavior by Logan or Smallwood. Thus, the reckless investigation claim also fails.

Furthermore, the Court finds that no reasonable jury could conclude that the original charges against Johnson were initiated without probable cause. The evidence at the first trial was sufficient to convince a unanimous jury of his guilt beyond a reasonable doubt. The guilty verdict was upheld on appeal *and* on collateral review. See also Wheeler, 639 F. App'x at 151

15

(Pennsylvania court's decision to schedule defendant for trial is evidence of an independent, contemporaneous judicial determination that there was sufficient probable cause). There is no evidence in the record that either Logan or Smallwood knew about Kenneth "Skinny" Robinson at the time of the original trial. Johnson was accused of assaulting Verna Robinson a month earlier for testifying against Griffin and she was scheduled to testify against Griffin again the day of the murder. (Doc. 44, Exh. B, C, D). Indeed, Johnson voluntarily went to the police because he assumed that he would be a suspect. (Doc. 44, Exh. E). Even if McBride was a less-than-perfect witness, the fact remains that she claimed to have personally seen the shooting and she unambiguously identified three specific individuals by name. (Doc. 44, Exh. F, G). As the Court of Appeals explained in Wilson, some "indication of unreliability does not, from the vantage point of the arresting officer, fatally undermine the forceful positive identification." 212 F.3d at 791. In summary, Defendants Logan and Smallwood are entitled to summary judgment.

### C. Claims Against Canofari and Weismantle

Plaintiff's claims against detectives Canofari and Weismantle are even more tenuous. It is undisputed that neither made the decision to re-try Johnson. That decision was made by District Attorney Zappala before ADA Broman, Canofari or Weismantle had any involvement in the matter. Complaint at ¶ 57 (Doc. 1). The extent of the detectives' participation was minimal. As Plaintiff points out, the "re-investigation" consisted of only six pages over five years. (Doc. 48, Exh. H). There is no evidence that Canofari and Weismantle had any authority to determine the scope of the investigation or to call McBride and Barbara Robinson as witnesses at the re-trial. Instead, they performed discrete tasks assigned by ADA Broman. Broman testified that he consulted with detectives, but "I ultimately make the decision" to prosecute and what evidence to

present. Broman Dep. at 40-41 (Doc. 48, Exh. E). There is no evidence that Canofari or Weismantle interfered with this discretion. Moreover, Plaintiff has not put forth any evidence of animosity or submission of false information by Canofari or Weismantle. Instead, he points to alleged omissions in the "re-investigation" – without showing that those omissions were in any way attributable to the Defendants. Accordingly, Canofari and Weismantle are entitled to summary judgment.

## II. ORDER

For the reasons stated above, Defendants Logan, Smallwood, Canofari and Weismantle's Motion for Summary Judgment **(Doc. 42)** is **GRANTED**.

IT IS SO ORDERED.


December 12, 2016

s/Cathy Bissoon
Cathy Bissoon
United States District Judge


cc (via ECF email notification):

All counsel of record.